**RICHARD R. BEST**
**REGIONAL DIRECTOR**
Lara S. Mehraban
Gerald A. Gross
Preethi Krishnamurthy
Eric M. Schmidt
Attorneys for the Plaintiff
**SECURITIES AND EXCHANGE COMMISSION**
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0116 (Krishnamurthy)
krishnamurthyp@sec.gov

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> -against- <br><br> BRUCE SCHOENGOOD, MEDIFIRST SOLUTIONS, INC., AND JOSHUA TYRELL, <br><br> Defendants. | **COMPLAINT** <br><br> 21 Civ. 00979 (    ) <br><br> **JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against

defendants Bruce Schoengood ("Schoengood"), Medifirst Solutions, Inc. ("Medifirst"), and Joshua

Tyrell ("Tyrell") (collectively, "Defendants"), alleges as follows:

**SUMMARY**

1.      From at least December 2016 through May 2017, Schoengood, Medifirst's president

and chief executive officer; Medifirst; and Tyrell, a stock promoter, engaged in a fraudulent scheme

designed to evade certain registration requirements of the federal securities laws. In addition, from

August through November 2017, Schoengood engaged in a separate scheme to manipulate the price of Medifirst's stock.

2.　In approximately December 2016, Medifirst, through Schoengood, and Tyrell entered into a sham agreement. Under the agreement's terms, Tyrell would purportedly provide "business development" consulting services to Medifirst. In return, Medifirst would issue 11 million shares of its stock (later amended to include 9 million additional shares) to Tyrell upon registering the issuance with the Commission on Form S-8, a registration form that permits securities issuers to register certain issuances of stock—*but not* stock paid in compensation for stock promotion services.

3.　In reality, as Tyrell and Schoengood knew, Tyrell never provided any business consulting services to Medifirst. Through Schoengood, Medifirst in fact issued stock to Tyrell as compensation for promoting Medifirst stock to potential investors through a stock promotion entity ("Promoter A") affiliated with Tyrell.

4.　Because Form S-8 did not permit registration of stock issuances for such purposes, Schoengood and Tyrell, among other things, falsely represented to Tyrell's brokerage firm that Tyrell was receiving Medifirst stock as compensation for business development services and that Tyrell was not involved in promoting Medifirst stock.

5.　Of the 20 million Medifirst shares he received, Tyrell later sold over 19 million shares to unwitting investors in the public market without registration for proceeds of approximately $125,000.

6.　In addition, from August through November 2017, Schoengood arranged, through another stock promoter ("Promoter B"), to have a third-party purchase Medifirst stock in exchange for cash payments in order to manipulate the market price of Medifirst stock.

## VIOLATIONS

7.      By virtue of the conduct alleged in this Complaint, Schoengood violated Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1) and 77q(a)(3)], Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78i(a)(2) and 78j(b)], and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5].

8.      By virtue of the conduct alleged in this Complaint, Medifirst violated Securities Act Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1) and 77q(a)(3)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5].

9.      By virtue of the conduct alleged in this Complaint, Tyrell violated Securities Act Sections 5(a), 5(c), 17(a)(1), 17(a)(2) and 17(a)(3) [15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1), 77q(a)(2) and 77q(a)(3)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)], and Rule 10b-5 [17 C.F.R. § 240.10b-5].

10.     Unless Defendants are restrained and enjoined, they will again engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

11.     The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)] and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

12.     The Commission seeks a final judgment: (a) permanently enjoining Defendants from violating the federal securities laws and rules this Complaint alleges they have violated; (b) ordering Tyrell to disgorge the ill-gotten gains he received as a result of the violations alleged herein and to pay prejudgment interest thereon, pursuant to Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)] and Sections 6501(a)(1) and (a)(3) of the National Defense Authorization Act for Fiscal Year 2021,

Pub. L. No. 116-283, to be codified at 15 U.S.C. §§ 78u(d)(3) and 78u(d)(7); (c) ordering

Schoengood and Tyrell to pay civil money penalties, pursuant to Securities Act Section 20(d) [15

U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently

prohibiting Schoengood from serving as an officer or director of any company that has a class of

securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file

reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section

20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; (e) permanently

prohibiting Schoengood and Tyrell from participating in any offering of a penny stock, pursuant to

Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)]; and (f) ordering any other relief the Court

may deem just and proper.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action under Securities Act Section 22(a)

[15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

14.     Defendants, directly or indirectly, have made use of the means or instrumentalities of

interstate commerce or of the mails in connection with the transactions, acts, practices, and courses

of business alleged herein.

15.     Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and

Exchange Act Section 27 [15 U.S.C. § 78aa]. Among other things, orders for the manipulative trades

alleged here were placed in Nassau County in the Eastern District of New York. In addition,

investors residing in the Eastern District of New York, including investors residing in Brooklyn or

Queens, bought Medifirst stock on days that Tyrell sold shares into the public market and on days

that Schoengood had arranged for manipulative trading in Medifirst stock.

## THE DEFENDANTS

16.     **Schoengood,** age 62, is a resident of Manalapan, New Jersey, and has been Medifirst's CEO since at least 2011.

17.     **Medifirst** is a Nevada corporation with its principal office in Freehold, New Jersey. Medifirst currently claims to be marketing a "Laser Thermal Therapeutic Device." From December 2016 through November 2017 (the "Relevant Period"), Medifirst's common stock was quoted under the symbol "MFST" on OTC Link, an interdealer quotation and trade messaging system operated by OTC Markets Group, Inc. During the Relevant Period, Medifirst's common stock met the definition of a "penny stock" under Exchange Act Section 3(a)(51) [15 U.S.C. § 78c(a)(51)] and Rule 3a51-1 thereunder [17 C.F.R. § 240. 3a51-1], in part because the stock traded below five dollars per share.

18.     **Tyrell**, age 36, is a resident of Huntington Beach, California. From at least December 2016 through May 2017, Tyrell was associated with Promoter A, a California-based stock promotion firm.

## LEGAL FRAMEWORK: RELEVANT REGISTRATION REQUIREMENTS

19.     Congress enacted the Securities Act to regulate the offer and sale of securities.

20.     In contrast to ordinary commerce, Congress enacted a regime of full and fair disclosure, requiring those who offer and sell securities to the investing public to provide sufficient, accurate information to allow investors to make informed decisions before they invest.

21.     A registration statement is a filing with the Commission making the required disclosures in connection with the registration of a securities offering (among other types of registration). Such registration statements provide public investors with information about the securities issuer and the offering.

22.    Securities Act Sections 5(a) and 5(c) prohibit the offer or sale of securities in interstate commerce without registration, absent a valid exemption from registration.

23.    Commission Form S-8 is a short-form registration statement to register certain offerings or issuances of a public company's securities to people ("natural persons," not entities) who provide "bona fide services" to the company as long as the services "do not directly or indirectly promote or maintain a market for the" securities. An issuer cannot use Form S-8 to register the issuance of stock in compensation for stock promotion services.

24.    A Form S-8 registration statement is not valid if it is used to register a stock offering that does not meet the requirements for using a Form S-8 registration statement. For example, a Form S-8 registration statement is not valid if it is used to register stock paid in compensation for stock promotion services.

25.    Under certain conditions, a person who receives stock through an issuance registered on a valid Form S-8 statement may resell that stock in the public market without the filing of any further registration statement. This is because most market transactions are covered by a common registration exemption.

26.    Sometimes companies issue stock in unregistered "private" transactions. In such cases, the stock certificate typically carries a restrictive legend preventing its resale in an unregistered, non-exempt transaction.

## FACTS

## I.    DEFENDANTS ENGAGED IN A FRAUDULENT SCHEME TO SELL MEDIFIRST STOCK TO THE PUBLIC IN AN UNREGISTERED OFFERING.

27.    In the fall of 2016, Schoengood arranged to have the stock promotion firm Tyrell worked for, Promoter A, promote Medifirst stock by soliciting retail investors by telephone to purchase the stock in the public market.

28.     Schoengood arranged with Promoter A to use Tyrell as a conduit to receive Medifirst shares as compensation for Promoter A's promotion of Medifirst stock.

29.     Under the arrangement, Medifirst's issuance of shares was to be registered on Commission Form S-8 to enable Medifirst to issue the stock to Tyrell without any restrictive legend—that is, without any legend making clear that the shares cannot be resold into the public markets without meeting certain requirements. That way, Tyrell could immediately sell the shares he received to the public through market transactions.

**A.      The Purported Consulting Agreement and Tyrell's First 7.9 Million Shares**

30.     On December 8, 2016, Medifirst and Tyrell executed a purported consulting agreement (the "Consulting Agreement").

31.     Under the Consulting Agreement's terms, Tyrell purported to act as a "business development" consultant to Medifirst for six months in exchange for 11 million shares of Medifirst common stock in an issuance that Medifirst would register on Form S-8.

32.     The Consulting Agreement purported to require Tyrell "not [to] conduct any meetings with any prospective financial investors" in Medifirst.

33.     Tyrell and Schoengood, on Medifirst's behalf, signed the Consulting Agreement.

34.     On December 8, 2016, the same day Tyrell and Medifirst executed the Consulting Agreement, Medifirst filed a Form S-8 registration statement with the Commission, purporting to register Medifirst's issuances of 32 million shares of Medifirst stock to employees and consultants, pursuant to Medifirst's "MFST Equity Incentive Plan" (the "Incentive Plan").

35.     At the time, the instructions to the Commission's Form S-8 made clear to companies issuing stock that the Form S-8 could only be used to register securities issuances to people ("natural persons") who provide "bona fide services" to the company issuing the stock when the services "do not directly or indirectly promote or maintain a market for the" company's securities.

7

36.     Also on December 8, 2016, Schoengood signed a "Written Consent of the Sole Director of Medifirst Solutions, Inc." (the "December 8 Consent"), authorizing the issuance of 11 million shares of Medifirst stock to Tyrell.

37.     The December 8 Consent claimed that the shares were issued under the Incentive Plan "in connection with consulting services provided by [Tyrell]."

38.     The December 8 Consent also stated that the issuance of stock under the Incentive Plan "has been or will be registered on Form-8 with the SEC."

39.     Also on December 8, 2016, in a letter emailed to Medifirst's transfer agent (the "Transfer Agent"), Schoengood instructed the Transfer Agent to issue 7.9 million shares of Medifirst stock to Tyrell under the Incentive Plan.

40.     In his letter, Schoengood represented that the shares had been "issued for services rendered and registered pursuant to a registration statement on Form S-8" and therefore that the shares would be "free-trading and need not bear the standard 1933 Act legend," apparently referring to a legend that would have made clear that the shares could not be sold or transferred without further registration or an exemption from registration.

41.     Schoengood's letter bore a signature block identifying him as Medifirst's chief executive officer.

42.     Tyrell then arranged to have the 7.9 million Medifirst shares deposited into his account at a brokerage firm (the "Brokerage Firm").

43.     Specifically, on approximately December 9, 2016, Tyrell submitted an application to the Brokerage Firm to accept the deposit of 7.9 million Medifirst shares into his account at the Brokerage Firm.

44.     In his application, Tyrell represented to the Brokerage Firm that the Medifirst stock had been issued to him as compensation for "business development" services.

45.    On December 9, 2016, Tyrell emailed the Brokerage Firm's registered representative assigned to Tyrell's account (the "Registered Representative").

46.    In his email to the Registered Representative, Tyrell claimed that he was "not involved or aware in [sic] any stock promotion with Medifirst."

47.    On approximately the same day, Tyrell provided the Brokerage Firm with a copy of the Consulting Agreement, the December 8 Consent and Medifirst's December 8 instructions to the Transfer Agent.

48.    On December 12, 2016, Tyrell sent an email to the Transfer Agent and to the Registered Representative, attaching a copy of a legal opinion letter dated December 8, 2017 (the "December 8 Opinion Letter"), addressed to the Transfer Agent,

49.    The December 8 Opinion Letter stated that 7.9 million Medifirst shares "may be issued to [Tyrell] without a restrictive legend" and that Tyrell "may sell the [Medifirst shares] free of any restrictions on transfer without registration under the Securities Act pursuant to the [Form S-8 registration]."

50.    The December 8 Opinion Letter also instructed the Transfer Agent to issue the shares without a restrictive legend.

51.    The same day, Schoengood sent an email to Tyrell, directed to the Brokerage Firm.

52.    In his email, Schoengood claimed: "Mr. Tyrell has been engaged as a consultant to the company and as per our Consulting Agreement, his duties are not related to fundraising, [stock] market awareness, or Investor Relations."

53.    Schoengood's email bore a signature block identifying him as Medifirst's president.

54.    About an hour later, Tyrell forwarded Schoengood's email to the Brokerage Firm's Registered Representative.

55.     Two days later, on December 14, 2016, the Transfer Agent issued 7.9 million Medifirst shares to Tyrell without a restrictive legend.

56.     As Tyrell had arranged, those shares were deposited into his Brokerage Firm account.

**B.      Tyrell's Second Installment of 3.1 Million Shares**

57.     On January 17, 2017, in a letter emailed to the Transfer Agent, Schoengood instructed the Transfer Agent to issue an additional 3.1 million shares of Medifirst stock to Tyrell under the Incentive Plan, as already authorized by the December 8 Consent.

58.     In his letter, Schoengood represented that the shares had been "issued for services rendered and registered pursuant to a registration statement on Form S-8" and therefore that the shares would be "free-trading and need not bear the standard 1933 Act legend."

59.     Schoengood's letter bore a signature block identifying him as Medifirst's chief executive officer.

60.     On approximately January 19, 2017, Tyrell provided the Transfer Agent with a legal opinion letter dated January 19, 2017 (the "January 19 Opinion Letter"), addressed to the Transfer Agent, that 3.1 million Medifirst shares "may be issued to [Tyrell] without a restrictive legend" and that Tyrell "may sell the [Medifirst shares] free of any restrictions on transfer without registration under the Securities Act pursuant to the [Form S-8 registration]."

61.     The January 19 Opinion Letter instructed the Transfer Agent to issue the shares without a restrictive legend.

62.     On approximately January 19, 2017, Tyrell submitted an application to the Brokerage Firm to accept his deposit of 3.1 million Medifirst shares into his account at the Brokerage Firm.

63.     In his application, Tyrell represented to the Brokerage Firm that the Medifirst stock had been issued to him as compensation for "business development" services.

64.     On approximately the same day, Tyrell provided the Brokerage Firm with copies of the January 19 Opinion Letter and Medifirst's January 19 instructions to the Transfer Agent.

65.     Also on approximately the same day, Tyrell sent an email to the Brokerage Firm's Registered Representative and claimed: "I Joshua Tyrell, am not involved in any stock promotion or capital raising with Medifirst."

66.     On January 24, 2017, the Transfer Agent issued 3.1.million Medifirst shares to Tyrell.

67.     As Tyrell had arranged, those shares were deposited into his account at the Brokerage Firm.

### C.     Tyrell's Third Installment of 5 Million Shares

68.     On February 2, 2017, Medifirst and Tyrell amended the Consulting Agreement to provide for the issuance of an additional 5 million Medifirst shares to Tyrell.

69.     Schoengood, on Medifirst's behalf, and Tyrell signed the amended agreement.

70.     On February 3, 2017, in a letter he emailed to the Transfer Agent, Schoengood instructed the Transfer Agent to issue an additional 5 million shares of Medifirst stock to Tyrell under the Incentive Plan and represented that the shares had been "issued for services rendered and registered pursuant to a registration statement on Form S-8" and therefore that the shares would be "free-trading and need not bear the standard 1933 Act legend."

71.     Schoengood's letter bore a signature block identifying him as Medifirst's chief executive officer.

72.     On February 3, 2017, Schoengood provided the Transfer Agent with a "Written Consent of the Sole Director of Medifirst Solutions, Inc." (the "February 3 Consent") signed by Schoengood, authorizing the issuance of 5 million shares of Medifirst stock to Tyrell.

73.     The February 3 Consent claimed that the shares were issued under the Incentive Plan "in connection with consulting services provided by [Tyrell]."

11

74.     The February 3 Consent also stated that the issuance of stock under the Incentive Plan "has been or will be registered on Form-8 with the SEC."

75.      On approximately February 3, 2017, Tyrell provided the Transfer Agent with a legal opinion letter dated February 3, 2017 ("February 3 Opinion Letter"), addressed to the Transfer Agent, that 5 million Medifirst shares "may be issued to [Tyrell] without a restrictive legend" and that Tyrell "may sell the [Medifirst shares] free of any restrictions on transfer without registration under the Securities Act pursuant to the [Form S-8 registration]."

76.     The February 3 Opinion Letter instructed the Transfer Agent to issue the shares without a restrictive legend.

77.     On approximately February 6, 2017, Tyrell submitted an application to the Brokerage Firm to accept the deposit of 5 million Medifirst shares into Tyrell's account at the Brokerage Firm.

78.     In his application, Tyrell represented to the Brokerage Firm that the Medifirst stock had been issued to him as compensation for "business development" services.

79.     On approximately February 6, 2017, Tyrell provided the Brokerage Firm with a copy of the February 3 Consent, Medifirst's February 3, 2017 instructions to the Transfer Agent, and the February 3 Opinion Letter.

80.     On February 6, 2017, Tyrell sent an email to the Brokerage Firm's Registered Representative and claimed: "I am not involved in any capital raising with [Medifirst]."

81.     On February 7, 2017, the Transfer Agent issued 5 million Medifirst shares to Tyrell.

82.     As Tyrell had arranged, the 5 million shares were deposited into his account at the Brokerage Firm.

### D.      Tyrell's Fourth Installment of 4 Million Shares

83.     On March 1, 2017, Medifirst and Tyrell amended the Consulting Agreement again to provide for the issuance of an additional 4 million Medifirst shares to Tyrell.

84.     On March 2, 2017, Schoengood signed a "Written Consent of the Sole Director of Medifirst Solutions, Inc." (the "March 2 Consent"), authorizing the issuance of 4 million shares of Medifirst stock to Tyrell.

85.     The March 2 Consent claimed that the shares were issued under the Incentive Plan "in connection with consulting services provided by [Tyrell]."

86.     The March 2 Consent also stated that the issuance of stock under the Incentive Plan "has been or will be registered on Form-8 with the SEC."

87.     On March 2, 2017, in a letter he emailed to the Transfer Agent, Schoengood instructed the Transfer Agent to issue an additional 4 million shares of Medifirst stock to Tyrell under the Incentive Plan, and represented that the shares had been "issued for services rendered and registered pursuant to a registration statement on Form S-8" and therefore that the shares would be "free-trading and need not bear the standard 1933 Act legend."

88.     Schoengood's letter bore a signature block identifying him as Medifirst's chief executive officer.

89.     On that date, Tyrell provided to the Transfer Agent a legal opinion letter dated March 1, 2017 (the "March 1 Opinion Letter"), addressed to the Transfer Agent, that 4 million Medifirst shares "may be issued to [Tyrell] without a restrictive legend" and that Tyrell "may sell the [Medifirst shares] free of any restrictions on transfer without registration under the Securities Act pursuant to the [Form S-8 registration]."

90.     The March 1 Opinion Letter instructed the Transfer Agent to issue the shares without a restrictive legend.

91.     On approximately March 2, 2017, Tyrell submitted an application to the Brokerage Firm to accept the deposit of 4 million Medifirst shares into his account at the Brokerage Firm.

92.     In his application, Tyrell represented to the Brokerage Firm that the Medifirst stock had been issued to him as compensation for "Product Marketing and Ongoing Business Development."

93.     On approximately March 2, 2017, Tyrell provided the Brokerage Firm with a copy of the March 2 Consent, Medifirst's March 2, 2017 instructions to the Transfer Agent, and the March 1 Opinion Letter.

94.     Also on March 2, 2017, Tyrell sent an email to the Brokerage Firm's Registered Representative and again claimed: "I am not aware or involved in any stock promotion or capital raising with Medifirst Solutions, Inc."

95.     On March 6, 2017, the Transfer Agent issued 4 million Medifirst shares to Tyrell.

96.     As Tyrell had arranged, the 4 million shares were deposited into his account at the Brokerage Firm.

**E.      Tyrell's Sales of the Shares and Phone Call with Schoengood**

97.     From December 16, 2016 through May 1, 2017, Tyrell sold at least 19 million of the 20 million Medifirst shares issued to him pursuant to the purported Consulting Agreement into the public market.

98.     Tyrell received about $125,000 in proceeds from these sales.

99.     On December 5, 2017, Tyrell spoke to Schoengood by telephone to discuss Tyrell's stock promotion activities.

100.     In this call, Tyrell described how the salesmen at Promoter A called potential investors and started selling stock:

> [I]t takes a week or two for my guys to really start ramping up . . . start building the momentum. That's how it kind of works with the phone calls.

> You start with one, two, ten people . . . they get other people. You talk about it, then they see it start trading, then they start jumping on it and chase it. You know how psychology works.

## II.    SCHOENGOOD MADE MANIPULATIVE TRADES IN MEDIFIRST STOCK.

101.    Prior to 2017, Promoter B, another stock promoter, told Schoengood that Promoter B knew a broker who would buy Medifirst stock in exchange for a cash kickback (the "Buyer").

102.    From August 1, 2016 through August 22, 2017, the price of Medifirst stock ranged from $0.012 to $0.0016 per share in reported transactions.

103.    During the same period, the daily trading volume of Medifirst stock ranged from 61,000 shares to 64,882,000 shares in reported transactions.

104.    On six occasions from August 23, 2017 through November 2017, Schoengood arranged through Promoter B to have the Buyer purchase over 10.6 million shares of Medifirst stock in total in order to keep the price of Medifirst stock from falling.

105.    On August 23, 2017, the price of Medifirst stock opened at $0.0016 per share.

106.    That day, the lowest reported price at which Medifirst stock traded was $0.0015 per share.

107.    On August 23, 2017, Schoengood and Promoter B spoke by telephone.

108.    On that call, Schoengood asked Promoter B to arrange for the Buyer to buy 500,000 shares of Medifirst stock.

109.    The same day, after the call, the Buyer purchased 500,000 Medifirst shares at $0.0017 per share.

110.    That same day, the highest reported price at which Medifirst stock traded was $0.0017 per share.

111.    Two days later, on August 25, 2017, Schoengood spoke to Promoter B by telephone.

112.     On that call, Schoengood explained to Promoter B that he was using the Buyer's purchases to keep Medifirst's share price from falling: "I'd rather use your fire power when we need it to hold [Medifirst's share price] . . . . I don't want it to dip less than .0017 . . . . Let's try and hold it there."

113.     On September 11, 2017, the price of Medifirst stock opened at $0.0016 per share.

114.     That day, the lowest reported price for Medifirst stock was $0.0015 per share.

115.     On September 11, 2017, Schoengood spoke to Promoter B by telephone.

116.     On that call, Schoengood asked Promoter B to arrange for the purchase of Medifirst stock to "support" Medifirst's stock price: Schoengood asked Promoter B to "contribute a little bit" and "make sure there's a little support" for Medifirst's share price.

117.     That day, following the call, the Buyer purchased 500,000 Medifirst shares at $0.0016 per share.

118.     That day, the highest reported price for Medifirst stock was $0.0016 per share.

119.     The following month, on October 24, 2017, Schoengood spoke to Promoter B by telephone.

120.     On that call, Schoengood asked Promoter B to have the Buyer make some purchases as soon as possible "because I think we need a little boost."

121.     The next day, on October 25, 2017, the price of Medifirst stock opened at $0.0012 per share.

122.     The lowest reported price at which Medifirst stock traded that day was also $0.0012 per share.

123.     On October 25, 2017, the Buyer purchased approximately 3.4 million shares of Medifirst stock—over 40% of the total reported volume of Medifirst shares that traded that day—at $0.0013 per share.

124.    The day after that, on October 26, 2017, the price of Medifirst stock opened at $0.0012 per share.

125.    The lowest reported price at which Medifirst stock traded that day was also $0.0012 per share.

126.    On October 26, 2017, Schoengood again asked Promoter B to arrange for the Buyer to purchase Medifirst stock.

127.    Later on October 26, 2017, the Buyer purchased approximately 579,000 shares of Medifirst stock—almost 25% of the total reported volume of Medifirst shares that traded that day—at $0.0013 per share.

128.    The next day, on October 27, 2017, the price of Medifirst stock opened at $0.0012 per share.

129.    That day, the lowest reported price at which Medifirst stock traded was also $0.0012 per share.

130.    On October 27, 2017, Schoengood spoke to Promoter B on the telephone.

131.    During the call, Schoengood told Promoter B that "[w]e want to get some [.0013] bids in there."

132.    On the same call, Schoengood explained that he wanted "to tighten it up a little bit and then take some more of the [.0014]. If we hit the [.0012] then we are right back down."

133.    Promotor B asked Schoengood: "So bid a little [.0013] and then take out some [.0014]?" Schoengood responded: "[E]xactly."

134.    Later that day, the Buyer purchased approximately 2.8 million additional shares of Medifirst stock—over 70% of the total reported volume of Medifirst shares that traded that day—at $0.0013 per share.

135.    On November 13, 2017, Schoengood met with Promoter B.

17

136.    During the meeting Schoengood asked Promoter B about the Buyer and asked Promoter B: "Can we bring him back?"

137.    Promoter B explained that they would have to pay the Buyer kickbacks for prior trading.

138.    Schoengood replied: "Do me a favor, get him [the Buyer] going again."

139.    On November 15, 2017, the price of Medifirst stock opened at $0.001 per share.

140.    That day, the lowest reported price at which Medifirst stock traded was $0.0008 per share.

141.    On November 15, 2017, the Buyer purchased another 3 million shares of Medifirst stock at $0.001 per share.

142.    On November 17, 2017, Schoengood met with Promoter B and gave Promoter B $1,600 to be paid as a kickback to the Buyer for the Buyer's purchase of Medifirst shares.

143.    After the Buyer ceased buying Medifirst's stock, its price declined steadily.

144.    By July 20, 2018, the trading day before Medifirst implemented a reverse stock split at a ratio of 1-to-1000 shares (meaning every 1,000 shares were consolidated into a single share), Medifirst's closing stock price had dropped to $0.0002 per share.

## FIRST CLAIM FOR RELIEF
### Violations of Securities Act Sections 17(a)(1) and 17(a)(3)
### (All Defendants)

145.    Paragraphs 1 through 144 are realleged and incorporated by reference as if fully set forth herein.

146.    Schoengood, Medifirst and Tyrell, directly or indirectly, singly or in concert, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails, (a) have employed, are employing, or are about to employ, devices, schemes, or artifices to defraud; and/or (b) have engaged, are

engaging, or are about to engage in transactions, practices, or courses of business which operate, operated, or would operate as a fraud or deceit upon the purchasers of securities, in violation of Sections 17(a)(1) and 17(a)(3) of the Securities Act [Section 15 U.S.C. §§ 77q(a)(1) and 77q(a)(3)].

## SECOND CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)(2)
### (Tyrell)

147.    Paragraphs 1–5, 9–100 are realleged and incorporated by reference as if fully set forth herein.

148.    Tyrell, directly or indirectly, singly or in concert, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails, (a) has obtained, is obtaining, or is about to obtain, money or property by means of an untrue statement of a material fact or an omission of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, in violation of Section 17(a)(2) of the Securities Act [Section 15 U.S.C. § 77q(a)(2)].

## THIRD CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (All Defendants)

149.    Paragraphs 1 through 144 are realleged and incorporated by reference as if fully set forth herein.

150.    Schoengood, Medifirst and Tyrell, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange, knowingly or recklessly (a) have employed, are employing or are about to employ devices, schemes and artifices to defraud; (b) have made, are making or are about to make an untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or c) have engaged, are engaging or

are about to engage in transactions, practices or courses of business which have operated, operate or will operate as a fraud and deceit upon investors, in violation of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5].

## FOURTH CLAIM FOR RELIEF
### Violations of Exchange Act Section 9(a)(2)
### (Schoengood)

151.    Paragraphs 1, 6–7, 10–17, and 101–144 are realleged and incorporated by reference as if fully set forth herein.

152.    Schoengood, directly or indirectly, singly or in concert, by use of the means or instruments of transportation or communication in, or the means or instrumentalities of, interstate commerce or by the use of the mails, knowingly or recklessly, is effecting, has effected or is about to effect, a series of transactions in securities with respect to such security creating actual or apparent active trading in such security, or raising or depressing the price of such security, for the purpose of inducing the sale of such security by others, in violation of Exchange Act Section 9(a)(2) [15 U.S.C. §78i(a)(2)].

## FIFTH CLAIM FOR RELIEF
### Violations of Securities Act Sections 5(a) and (c)
### (All Defendants)

153.    Paragraphs 1–5 and 7–100 are realleged and incorporated by reference as if fully set forth herein.

154.    Schoengood, Medifirst and Tyrell, directly or indirectly, singly or in concert, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce, or by use of the mails, (a) have sold securities without a registration statement being in effect as to those securities through the medium of a prospectus or otherwise; and (b) have offered to sell or offered to buy through the medium of a prospectus or

otherwise a security, without a registration statement having been filed with the Commission as to such security, in violation of Securities Act Sections 5(a) and 5(c) [15 U.S.C. §§ 77e(a) and (c)].

## PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

### I.

Permanently enjoining Defendants Schoengood, Medifirst, and Tyrell, and their agents, servants, employees, and attorneys, and all persons in active concert or participation with any of them who receive actual notice of the final judgment by personal service or otherwise, and each of them, from future violations of Securities Act Sections 5 and 17(a) [15 U.S.C. §§ 77e and 77q(a)], Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5];

### II.

Permanently enjoining Defendant Schoengood, and his agents, servants, employees, and attorneys, and all persons in active concert or participation with any of them who receive actual notice of the final judgment by personal service or otherwise, and each of them, from future violations of Exchange Act Section 9(a) [15 U.S.C. §§ 78i(a)];

### III.

Ordering Defendant Tyrell to disgorge all ill-gotten gains he received directly or indirectly, with prejudgment interest thereon, as a result of his violations alleged in this Complaint, pursuant to Exchange Act Section 21(d)(5) [15 U.S.C. § 78u(d)(5)] and Sections 6501(a)(1) and (a)(3) of the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, to be codified at 15 U.S.C. §§ 78u(d)(3) and 78u(d)(7).

**IV.**

Ordering Defendants Schoengood and Tyrell to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 78t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

**V.**

Permanently prohibiting Defendant Schoengood from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 78t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)];

**VI.**

Permanently prohibiting Defendants Schoengood and Tyrell from participating in any offering of a penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock, under Exchange Act Section 21(d)(6) [15 U.S.C. § 78u(d)(6)]; and

## VII.

Granting any other and further relief as the Court may deem just and proper.

## JURY DEMAND

The Commission demands a trial by jury.

Dated:  New York, New York
February 23, 2021

  /s/ Richard R. Best
Richard A. Best
Lara S. Mehraban
Gerald A. Gross
Preethi Krishnamurthy
Eric M. Schmidt

SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0116 (Krishnamurthy)
Krishnamurthyp@sec.gov