UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
SECURITIES AND EXCHANGE
COMMISSION,

                  Plaintiff,

    -against-

BRUCE SCHOENGOOD, MEDIFIRST
SOLUTIONS, INC., and JOSHUA
TYRELL,

                  Defendants.
-----------------------------------------------------------x

**REPORT AND
RECOMMENDATION**

21-CV-979 (ENV) (SIL)

**STEVEN I. LOCKE, United States Magistrate Judge:**

Presently before the Court in this securities fraud action, on referral from the Honorable Eric N. Vitaliano for report and recommendation, is Plaintiff Security Exchange Commission's (the "SEC" or "Plaintiff") motion for default judgment against Defendant Medifirst Solutions, Inc. ("Medifirst" or "Defaulting Defendant"). *See* Notice of Plaintiff's Motion for Default Judgment ("Pl. Mot."), Docket Entry ("DE") [44]; Plaintiff's Memorandum of Law in Support of Its Motion for a Default Judgment ("Pl. Mem."), DE [44-1].   By way of Complaint dated February 23, 2021, the SEC brought this action against Bruce Schoengood, ("Schoengood"), Joshua Tyrell ("Tyrell") and Medifirst (collectively "Defendants") for violations of:  (i) Sections 5(a), 5(c), 17(a)(1) and 17(a)(3) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c), 77q(a)(1) and 77q(a)(3); and (ii) Sections 9(a)(2) and 10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78i(a)(2) and 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, for engaging in a

fraudulent scheme designed to evade certain registration requirements of the federal securities laws and manipulating the market price of Medifirst stock. *See generally* Complaint ("Compl."), DE [1]. The claims against Medifirst are for equitable relief only. *See* Compl. ¶¶ 12, 145-46, 149-50, 153-54. Medifirst failed to answer or otherwise respond to the Complaint, and the Clerk of the Court entered a Certificate of Default against it on July 27, 2022. *See* DE [43]. On July 29, 2022, Plaintiff filed the instant motion for default judgment pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 55(b)(2). *See* Pl. Mot. Judge Vitaliano referred the motion to this Court on August 1, 2022. *See* August 1, 2022 Electronic Order. For the reasons set forth below, the Court respectfully recommends granting the SEC's motion and entering its proposed order permanently enjoining Medifirst from committing future violations of Securities Act Sections 5 and 17(a) and Exchange Act Section 10(b) and Rule 10b-5. *See* Pl. Mem. Ex. 4, DE [44-6].

## I.   BACKGROUND

### A. Relevant Facts

All relevant facts are taken from the Complaint and the instant motion papers and assumed true for purposes of resolving this motion. *See Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 246 (2d Cir. 2004).

#### 1. The Parties

Medifirst is a Nevada corporation with its principal office in Freehold, New Jersey, and currently claims to be marketing a laser thermal therapeutic device. Compl. ¶ 17. From December 2016 through November 2017 (the "Relevant Period"), Medifirst's common stock was quoted under the symbol "MFST" on OTC Link, an

interdealer quotation and trade messaging system operated by OTC Markets Group, Inc. *Id*. During the Relevant Period, Medifirst's common stock met the definition of a "penny stock" under Exchange Act Section 3(a)(51) and Rule 3a51-1 thereunder, in part because the stock traded below five dollars per share. *Id*. Schoengood is a resident of Manalapan, New Jersey and has been Medifirst's CEO since at least 2011. *Id*. ¶ 16. Tyrell is a resident of Huntington Beach, California, and from at least December 2016 through May 2017, he was associated with Promoter A, a California-based stock promotion firm. *Id*. ¶ 18.

### 2. *The Consulting Agreement and Medifirst's Issuance of 7.9 Million Shares to Tyrell*

In fall 2016, Schoengood arranged to have Promoter A promote Medifirst stock by soliciting retail investors by phone to purchase the stock in the public market. *Id*. ¶¶ 18, 27. Schoengood agreed for Tyrell, one of Promoter A's associates, to serve as a conduit to receive Medifirst shares as compensation for his promotion of its stock. *Id*. ¶ 28. Under the arrangement, Medifirst's issuance of shares was to be registered on Commission Form S-8 ("Form S-8") to enable the company to issue the stock to Tyrell without any restrictive legend, meaning without any record indicating that the shares cannot be resold into the public markets without meeting certain requirements. *Id*. ¶ 29. That way, Tyrell could immediately sell the shares he received to the public. *Id*.

On December 8, 2016, the SEC alleges that Medifirst, through Schoengood, and Tyrell executed a sham consulting agreement (the "Consulting Agreement"). *Id*. ¶¶ 30, 33. Under the Consulting Agreement, Tyrell purported to act as a "business

development" consultant to Medifirst for six months in exchange for eleven million shares of common stock in an issuance that Medifirst would register on Form S-8. *Id.* ¶ 31. The Consulting Agreement provided that Tyrell was "not [to] conduct any meetings with any prospective financial investors" of Medifirst. *Id.* ¶ 32.

On that same day, Medifirst filed a Form S-8 registration statement with the SEC, purporting to register Medifirst's issuance of 32 million shares of common stock to employees and consultants pursuant to Medifirst's "MFST Equity Incentive Plan" (the "Incentive Plan"). *Id.* ¶ 34. At the time, the SEC's instructions made clear to companies issuing stock that Form S-8 could only be used to register securities issuances to natural persons who provide "bona fide services" to the company issuing the stock when the services "do not directly or indirectly promote or maintain a market" for the company's securities. *Id.* ¶ 35.

Also on December 8, 2016, Schoengood signed a "Written Consent of the Sole Director of Medifirst Solutions, Inc." (the "December 8 Consent"), authorizing the issuance of eleven million shares of Medifirst stock to Tyrell. *Id.* ¶ 36. The December 8 Consent provided that the shares were issued under the Incentive Plan in connection with "consulting services" provided by Tyrell, and that the issuance of stock had been or would be registered with the SEC on Form S-8. *Id.* ¶¶ 37-38. Then, in a letter emailed to Medifirst's transfer agent (the "Transfer Agent"), who is not identified in the Complaint, Schoengood instructed the Transfer Agent to issue 7.9 million shares of Medifirst stock to Tyrell under the Incentive Plan. *Id.* ¶ 39. In his letter, Schoengood represented that the shares had been issued for services rendered

pursuant to a registration statement on Form S-8, and, therefore, would be "free-trading and need not bear the standard 1933 Act legend," referring to a legend that would have made clear that the shares could not be sold or transferred without further registration or an exemption from registration. *Id*. ¶ 40. Schoengood signed the letter as Medifirst's CEO. *Id*. ¶ 41.

Tyrell arranged to have the 7.9 million Medifirst shares deposited into his account at an unidentified brokerage firm (the "Brokerage Firm"). *Id*. ¶ 42. Specifically, on approximately December 9, 2016, Tyrell requested that the Brokerage Firm accept a deposit of 7.9 million Medifirst shares into his account and represented that the stock had been issued to him as compensation for "business development" services. *Id*. ¶¶ 43-44. That same day, Tyrell emailed the Brokerage Firm's registered representative assigned to his account (the "Registered Representative"), who is also not identified in the Complaint, claiming that he was not involved or aware of any stock promotion with Medifirst. *Id*. ¶ 46. Tyrell then provided the Brokerage firm with a copy of the Consulting Agreement, the December 8 Consent, and Medifirst's December 8 instructions to the Transfer Agent. *Id*. ¶ 47.

On December 12, 2016, Tyrell emailed the Transfer Agent and the Registered Representative a copy of a legal opinion letter dated December 8, 2017 (the "December 8 Opinion Letter"), although Plaintiff fails to indicate who wrote the letter. *Id*. ¶ 48. The December 8 Opinion Letter stated that 7.9 million Medifirst shares may be issued to Tyrell without a restrictive legend, and that he may sell the shares free of any restrictions on transfer without further registration under the Securities Act

pursuant to the Form S-8 filing. *Id*. ¶ 49. The December 8 Opinion Letter instructed the Transfer Agent to issue the shares to Tyrell without a restrictive legend. *Id*. ¶ 50.

The same day, Schoengood sent an email to Tyrell directed to the Brokerage Firm claiming that Tyrell has been engaged as a consultant to Medifirst, and according to their Consulting Agreement, Tyrell's duties were not related to fundraising, stock market awareness, or investor relations. *Id*. ¶¶ 51-52. Schoengood's email identified him as Medifirst's president. *Id*. ¶ 53. Tyrell forwarded the email to the Brokerage Firm's Registered Representative. *Id*. ¶ 54. On December 14, 2016, the Transfer Agent issued 7.9 million Medifirst shares to Tyrell without a restrictive legend, which were deposited in his Brokerage Firm account. *Id*. ¶¶ 55-56.

### 3. *Medifirst's Issuance of 3.1 Million More Shares to Tyrell*

On January 17, 2017, Schoengood instructed in a letter emailed to the Transfer Agent to issue an additional 3.1 million shares of Medifirst stock to Tyrell under the Incentive Plan, as already authorized by the December 8 Consent. *Id*. ¶ 57. Schoengood represented that the shares had been issued for services rendered pursuant to a registration statement on Form S-8, and, therefore, would be "free-trading and need not bear the standard 1933 Act legend." *Id*. ¶ 58. Schoengood's letter identified him as Medifirst's CEO. *Id*. ¶ 59.

On approximately January 19, 2017, Tyrell provided the Transfer Agent with a legal opinion letter (the "January 19 Opinion Letter"), although Plaintiff fails to

indicate who wrote it. *Id*. ¶ 60. The January 19 Opinion Letter claimed that 3.1 million Medifirst shares may be issued to Tyrell without a restrictive legend and that he may sell the shares free of any restrictions on transfer without further registration under the Securities Act pursuant to the Form S-8 filing. *Id*. ¶ 60. The January 19 Opinion Letter instructed the Transfer Agent to issue the shares to Tyrell without a restrictive legend. *Id*. ¶ 61.

Also on approximately January 19, 2017, Tyrell requested that the Brokerage Firm accept a deposit of 3.1 million Medifirst shares into his account. *Id*. ¶ 62. In his application, Tyrell represented that the Medifirst stock had been issued to him as compensation for "business development" services. *Id*. ¶ 63. Tyrell provided the Brokerage Firm with copies of the January 19 Opinion Letter and Medifirst's January 19 instructions to the Transfer Agent. *Id*. ¶ 64. Tyrell then emailed the Brokerage Firm's Registered Representative and claimed: "I Joshua Tyrell, am not involved in any stock promotion or capital raising with Medifirst." *Id*. ¶ 65. On January 24, 2017, the Transfer Agent issued 3.1 million Medifirst shares to Tyrell, which were deposited into his Brokerage Firm account. *Id*. ¶¶ 66-67.

### 4. *Medifirst's Issuance of Five Million More Shares to Tyrell*

On February 2, 2017, Medifirst and Tyrell amended the Consulting Agreement to provide for the issuance of an additional five million Medifirst shares to Tyrell. *Id*. ¶ 68. Schoengood, on Medifirst's behalf, and Tyrell signed the amended agreement. *Id*. ¶ 69. On February 3, 2017, Schoengood instructed the Transfer Agent to issue an additional five million shares of Medifirst stock to Tyrell under the Incentive Plan

and again represented that the shares had been issued for services rendered pursuant to a registration statement on Form S-8, and, therefore, would be "free-trading and need not bear the standard 1933 Act legend." *Id*. ¶ 70. Schoengood's letter identified him as Medifirst's CEO. *Id*. ¶ 71.

That same day, Schoengood provided the Transfer Agent with a "Written Consent of the Sole Director of Medifirst Solutions, Inc." (the "February 3 Consent"), signed by Schoengood, authorizing the issuance of five million shares of Medifirst stock to Tyrell. *Id*. ¶ 72. The February 3 Consent claimed that the shares were issued under the Incentive Plan in connection with "consulting services" provided by Tyrell. *Id*. ¶ 73. The February 3 Consent also stated that the issuance of stock under the Incentive Plan had been or would be registered on Form S-8. *Id*. ¶ 74.

On approximately the same day, Tyrell provided the Transfer Agent with a legal opinion letter ("February 3 Opinion Letter"), stating that five million Medifirst shares may be issued to him without a restrictive legend and that Tyrell may sell the shares free of any restrictions on transfer without further registration under the Securities Act pursuant to the Form S-8 filing. *Id*. ¶ 75. The February 3 Opinion Letter instructed the Transfer Agent to issue the shares to Tyrell without a restrictive legend, although Plaintiff fails to indicate who wrote the letter. *Id*. ¶ 76.

On approximately February 6, 2017, Tyrell requested that the Brokerage Firm accept a deposit of five million Medifirst shares into his account. *Id*. ¶ 77. In his application, Tyrell represented that the Medifirst stock had been issued to him as compensation for "business development" services. *Id*. ¶ 78. Tyrell provided the

Brokerage Firm with a copy of the February 3 Consent, Medifirst's February 3, 2017 instructions to the Transfer Agent, and the February 3 Opinion Letter. *Id*. ¶ 79. That same day, Tyrell sent an email to the Brokerage Firm's Registered Representative and claimed: "I am not involved in any capital raising with [Medifirst]." *Id*. ¶ 80. On February 7, 2017, the Transfer Agent issued five million Medifirst shares to Tyrell, which were deposited into his Brokerage Firm account. *Id*. ¶¶ 81-82.

### 5. *Medifirst's Issuance of Four Million More Shares to Tyrell*

On March 1, 2017, Medifirst and Tyrell amended the Consulting Agreement again to provide for the issuance of an additional four million shares to Tyrell. *Id*. ¶ 83. On March 2, 2017, Schoengood signed a "Written Consent of the Sole Director of Medifirst Solutions, Inc." (the "March 2 Consent"), authorizing the issuance. *Id*. ¶ 84. The March 2 Consent claimed that the shares were issued under the Incentive Plan in connection with "consulting services" provided by Tyrell. *Id*. ¶ 85. The March 2 Consent also stated that the issuance of stock under the Incentive Plan had been or would be registered on Form S-8 with the SEC. *Id*. ¶ 86.

On March 2, 2017, Schoengood instructed in a letter that he emailed to the Transfer Agent to issue an additional four million shares of Medifirst stock to Tyrell under the Incentive Plan and represented that the shares had been issued for services rendered pursuant to a registration statement on Form S-8, and, therefore, would be "free-trading and need not bear the standard 1933 Act legend." *Id*. ¶¶ 86-87. Schoengood's letter identified him as Medifirst's CEO. *Id*. ¶ 88.

On the same day, Tyrell provided the Transfer Agent with legal opinion letter dated March 1, 2017 (the "March 1 Opinion Letter"), although Plaintiff again fails to indicate who wrote it. *Id.* ¶ 89. The March 1 Opinion Letter claimed that four million Medifirst shares may be issued to Tyrell without a restrictive legend and that he may sell the shares free of any restrictions on transfer without further registration under the Securities Act pursuant to the Form S-8 filing. *Id.* ¶ 89. The March 1 Opinion Letter instructed the Transfer Agent to issue the shares to Tyrell without a restrictive legend. *Id.* ¶ 90.

On approximately March 2, 2017, Tyrell requested that the Brokerage Firm accept a deposit of four million Medifirst shares into his account. *Id.* ¶ 91. Tyrell represented that the Medifirst stock had been issued to him as compensation for "Product Marketing and Ongoing Business Development." *Id.* ¶ 92. Tyrell provided the Brokerage Firm with a copy of the March 2 Consent, Medifirst's March 2, 2017 instructions to the Transfer Agent, and the March 1 Opinion Letter. *Id.* ¶ 93. Also on March 2, 2017, Tyrell sent an email to the Brokerage Firm's Registered Representative and again claimed: "I am not aware or involved in any stock promotion or capital raising with Medifirst Solutions, Inc." *Id.* ¶ 94. On March 6, 2017, the Transfer Agent issued four million Medifirst shares to Tyrell, which were deposited into his Brokerage Firm account. *Id.* ¶¶ 95-96.

### 6. *Tyrell's Sales of the Shares and Phone Call with Schoengood*

From December 16, 2016, through March 1, 2017, the SEC alleges that Tyrell sold at least 19 million of the 20 million Medifirst shares issued to him pursuant to

10

the purported Consulting Agreement on the public market. *Id.* ¶ 97. Tyrell received about $125,000 in proceeds from these sales. *Id.* ¶ 98. On December 5, 2017, Tyrell spoke to Schoengood by telephone to discuss Tyrell's stock promotion activities. *Id.* ¶ 99. On the call, Tyrell described how the salesmen at Promoter A called potential investors and started selling stock:

> [I]t takes a week or two for my guys to really start ramping up . . . start building the momentum. That's how it kind of works with the phone calls. You start with one, two, ten people . . . they get other people. You talk about it, then they see it start trading, then they start jumping on it and chase it. You know how psychology works.

*Id.* ¶ 100.

### 7. *Schoengood's Guilty Plea in the Parallel Criminal Action*

On February 19, 2021, a criminal complaint was filed in this District against Schoengood. *See United States v. Schoengood*, No. 21-cr-00261-SJ (E.D.N.Y. Feb. 19, 2021) Criminal Docket Entry ("Crim. DE") [1], [3]. On May 21, 2021, the United States Attorney for the Eastern District of New York filed a one-count information against Schoengood that charged him with conspiracy to commit securities fraud, based partly on the same consulting agreement and issuance of Medifirst shares to Tyrell described above. Crim. DE [15]. Schoengood pled guilty to the one-count information. *See* Pl. Mem. Ex. 5, Transcript of Schoengood's plea hearing and allocution ("Schoengood Tr.") at 24, 21-25. In his plea allocution, Schoengood admitted to providing shares to a stock promoter through a sham consulting agreement, which claimed that the shares were for consulting services rather than for stock promotion activities. *Id.* at 25, 19-23. Magistrate Judge Kuo found that

there was a factual basis for Schoengood's guilty plea and recommended that his guilty plea be accepted. *Id*. at 29, 9-12; Crim. DE [17].[1]  According to Plaintiff, no date has been set for Schoengood's sentencing.

### B. Procedural History

Based on the above, the SEC commenced this action by way of Complaint dated February 23, 2021 alleging violations of: (i) Securities Act Sections 17(a)(1) and 17(a)(3), Exchange Act Section 10(b) and Rule 10b-5 thereunder, and Securities Act Sections 5(a) and (c) against all Defendants; (ii) Securities Act Section 17(a)(2) against Tyrell; and (iii) Exchange Act Section 9(a)(2) against Schoengood. *See* Compl. Plaintiff seeks permanent injunctions as to all Defendants as well as disgorgement and civil monetary penalties, among other relief, against Schoengood and Tyrell. *See id*. On April 2, 2021, Schoengood—on his own behalf and on Medifirst's behalf— waived service of the Summonses and signed waivers acknowledging his and Medifirst's receipt of the Complaint, pursuant to Fed. R. Civ. P. 4(d). DEs [9], [10]. Under Rule 4(d)(3), Medifirst was originally required to respond to the Complaint by May 9, 2021. DE [9]. On May 11, 2021, the Court extended Schoengood's and Medifirst's time to respond to the Complaint until July 9, 2021. DE [16]. Neither Schoengood nor Medifirst filed an answer, however.

On January 14, 2022, the Court entered a consent judgment against Schoengood permanently restraining and enjoining him from violating:

---

[1] The case was recently reassigned to District Judge Gonzalez, and Magistrate Judge Kuo's recommendation of acceptance of the guilty plea is still pending. *See* Crim. DE [17]; October 12, 2022 Electronic Order.

Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. § 240.10b-5], by using any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, in connection with the purchase or sale of any security: (a) to employ any device, scheme, or artifice to defraud; (b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

DE [33]. At a June 13, 2022 status conference with the Court, the SEC indicated it was waiting for the Schoengood's criminal sentencing before addressing the issues of disgorgement and civil penalties as to him. *See* DEs [33], [39]. On June 16, 2022, the Court entered a similar consent judgment against Tyrell who was then dismissed from the lawsuit. *See* DE [40].

To date, Medifirst has not answered, moved, or otherwise responded to the Complaint or appeared through counsel. On July 22, 2022, the SEC requested a certificate of default against Medifirst, which the Clerk of the Court entered on July 27, 2022. DEs [42], [43]. On July 29, 2022, Plaintiff filed the instant motion for default judgment. *See* Pl. Mot.; Pl. Mem. Judge Vitaliano referred the motion to this Court on August 1, 2022 for report and recommendation. *See* August 1, 2022 Electronic Order. For the reasons set forth below, the Court respectfully recommends granting the motion and entering a permanent injunction against Medifirst.

## II.   LEGAL STANDARD

Motions for default judgment are governed by Rule 55 of the Federal Rules of Civil Procedure ("Fed. R. Civ. P."), which provides for a two-step process. *See*

Fed. R. Civ. P. 55; *Priestley v. Headminder, Inc.*, 647 F.3d 497, 504-05 (2d Cir. 2011). Initially, the moving party must obtain a certificate of default from the Clerk of the Court. *See* Fed. R. Civ. P. 55(a). Once the certificate of default is issued, the moving party may apply for entry of a default judgment. *See id.* at 55(b). Where a default occurs, the well-pleaded factual allegations set forth in a complaint relating to liability are deemed true. *See Vermont Teddy Bear Co.*, 373 F.3d at 246; *see also* Fed. R. Civ. P. 8(b)(6) ("An allegation—other than one relating to the amount of damages—is admitted if a responsive pleading is required and the allegation is not denied."). The entry of a default judgment, however, is "entrusted to the sound judicial discretion of the court," and a party is not entitled to a default judgment as a matter of right. *Allstate Ins. Co. v. Howell*, No. 09-cv-4660, 2013 WL 5447152, at *1 (E.D.N.Y. Sep. 30, 2013) (citation omitted). In light of the Second Circuit's "oft-stated preference for resolving disputes on the merits," default judgments are "generally disfavored," and doubts should be resolved in favor of the defaulting party. *See Guanglei Jiao v. Shang Shang Qian Inc.*, No. 18CIV5624ARRVMS, 2020 WL 6370148, at *10-11 (E.D.N.Y. Aug. 11, 2020), *report and recommendation adopted*, No. 18CV5624ARRVMS, 2020 WL 5105063 (E.D.N.Y. Aug. 31, 2020) (internal quotations and citations omitted).

A plaintiff seeking a default judgment must demonstrate that its "uncontroverted allegations, without more, establish the defendant's liability on each asserted cause of action." *Gunawan v. Sake Sushi Rest.*, 897 F. Supp. 2d 76, 83 (E.D.N.Y. 2012). In determining whether to grant a motion for default judgment, the

14

court has the "responsibility to ensure that the factual allegations, accepted as true, provide a proper basis for liability and relief." *Ferrera v. Tire Shop Ctr.*, No. 14-cv-4657, 2015 WL 3562624, at \*2 (E.D.N.Y. Apr. 6, 2015), *report and recommendation adopted*, No. 14-cv-4657, 2015 WL 3604078 (E.D.N.Y. June 5, 2015) (internal quotation and citation omitted). Accordingly, prior to entering a default judgment, the court must determine whether the plaintiff's allegations establish the defendant's liability "as a matter of law." *Bricklayers & Allied Craftworkers Local 2, Albany, N.Y. Pension Fund v. Moulton Masonry & Const., LLC*, 779 F.3d 182, 187 (2d Cir. 2015). Once liability has been established, the court must determine the appropriate relief and amount of damages, if any, that may be assessed. *See Lyons P'ship, L.P. v. D & L Amusement & Entm't, Inc.*, 702 F. Supp. 2d 104, 111 (E.D.N.Y. 2010).

## III.   DISCUSSION

### A.  Liability

Initially, the Court must consider whether the factual allegations set forth in the Complaint, taken as true, establish liability against the Defaulting Defendant. *See Ferrara v. PJF Trucking LLC*, No. 13-CV-7191, 2014 WL 4725494, at \*7 (E.D.N.Y. Sep. 22, 2014) ("Although Defendant's default constitutes an admission of all factual allegations in the Complaint as they relate to liability, Plaintiffs must nevertheless demonstrate that the uncontested allegations set forth valid claims."). The SEC alleges that Medifirst violated anti-fraud and certain registration provisions of federal securities laws:  (i) Securities Act Sections 17(a)(1), 17(a)(3), and Exchange Act Section 10(b) and Rule 10b-5 thereunder; and (ii) Securities Act Section 5(a), and 5(c). Each claim is addressed separately.

15

*1.  Plaintiff's Securities Act Sections 17(a)(1), 17(a)(3) and Exchange Act Section 10(b) and Rule 10b-5 Claims*

To establish that Medifirst committed a violation of Securities Act Sections 17(a)(1) and 17(a)(3), Exchange Act Section 10(b), and Rule 10b-5, known as scheme liability, the SEC must show that Medifirst:  "(1) . . . used a fraudulent device [or scheme]; (2) with scienter; (3) in connection with the purchase or sale of securities." *SEC v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999) (citation omitted); *see also* 15 U.S.C. § 77q; 17 C.F.R. § 240.10b-5.  The SEC must also show that the fraud was committed "by the use of any means" or instrumentality of "interstate commerce."  15 U.S.C. §§ 77q, 78j(b).  Moreover, liability for a scheme to defraud under these provisions may attach to a corporate defendant under principles of *respondeat superior.  See, e.g., Suez Equity Investors, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 100-01, 105 (2d Cir. 2001) (reversing district court's dismissal of a Section 10(b) primary liability claim against corporate defendants because the complaint adequately alleged fraud by defendants' agent); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 543 (S.D.N.Y. 2011) ("When the defendant is a corporate entity, the law imputes the state of mind of the employees or agents who made the statement(s) to the corporation.") (citation omitted); *In re Parmalat Sec. Litig.*, 474 F. Supp. 2d 547, 550 (S.D.N.Y. 2007) ("[P]rincipals typically are liable for torts and crimes committed by their agents acting within the scope of their authority. This long has been applied to impose *respondeat superior* liability in federal securities and criminal cases.").

For liability under Securities Act Sections 17(a)(1) and 17(a)(3) and Exchange Act Section 10(b) and Rule 10b-5(a) and (c), "misstatements and omissions can form part of a scheme liability claim, but an actionable scheme liability claim also requires something beyond misstatements and omissions." *SEC v. Rio Tinto plc*, 41 F.4th 47, 48 (2d Cir. 2022). A defendant's participation in sham transactions and contracts is one type of fraudulent conduct that is actionable under these provisions, even when the scheme's ultimate connection to investors was misrepresentations made by others. *In re Global Crossing, Ltd. Sec. Litig.*, 322 F. Supp. 2d 319, 335-36 (S.D.N.Y. 2004) (defendant accounting firm, which was the "chief architect and executor" of "sham swap transactions" used to inflate companies' revenues, could be held liable under Rule 10b-5(a) and (c) even "absent a fraudulent statement by the defendant"); *In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 502 (S.D.N.Y. 2005) (directly or indirectly using "a manipulative or deceptive device (like the creation or financing of a sham entity) intended to mislead investors, even if a material misstatement by another person creates the nexus between the scheme and the securities market[,]" constituted a violation of Rule 10b-5(a) and (c)) (citation omitted).

The next element, scienter, is a "'mental state embracing the intent to deceive, manipulate or defraud.'" *RFE Inv. Partners VI, L.P. v. Jacobs*, 03-CV-3530 (JS)(MLO), 2007 WL 9706984, at *3 (E.D.N.Y. Mar. 30, 2007) (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, n. 12 (1976)). The defendant's knowledge or recklessness satisfies the scienter requirement. *Novak v. Kasaks,* 216 F.3d 300, 308-12 (2d Cir. 2000). Recklessness is "at the least, conduct which is highly unreasonable

and which represents an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* at 308 (internal quotation marks and citation omitted). "Representing information as true while knowing it is not, recklessly misstating information, or asserting an opinion on grounds so flimsy as to belie any genuine belief in its truth, are all circumstances sufficient to support a conclusion of scienter." *SEC v. Universal Express, Inc.*, 475 F. Supp. 2d 412, 424 (S.D.N.Y. 2007), *aff'd sub nom. SEC v. Altomare*, 300 Fed. App'x 70 (2d Cir. 2008).

Finally, Courts interpret the "in connection with" or "nexus" requirement for scheme liability broadly. *See SEC v. Zandford*, 535 U.S. 813, 819-20, 122 S. Ct. 1899, 1903 (2002). "It is enough that the scheme to defraud and the sale of securities coincide." *Id.* at 822; *see also* 15 U.S.C. §§ 77q(a), 78j(b); 15 U.S.C. § 78(c)(10) ("The term 'security' means any note, stock, treasury stock . . . ."). The nexus requirement can be satisfied by fraud occurring at any point in "the entire selling process." *SEC v. Czarnik*, No. 10 CIV. 745 PKC, 2010 WL 4860678, at *4 (S.D.N.Y. Nov. 29, 2010) (quoting *United States v. Naftalin*, 441 U.S. 768, 773, 99 S. Ct. 2077, 2082 (determining no requirement "that the fraud occur in any particular phase of the selling transaction")).

Applying these standards, the Court concludes that the SEC sufficiently sets forth Medifirst's liability as to the alleged violations of Securities Act Sections 17(a)(1), 17(a)(3) and Exchange Act 10(b) and Rule 10b-5. Initially, Plaintiff alleges that Schoengood, on Medifirst's behalf, orchestrated and executed a sham consulting

contract with Tyrell, which satisfies the fraudulent device requirement.  Compl. ¶¶ 2-3, 30-41, 100.  The Consulting Agreement enabled Schoengood to have Medifirst issue freely-tradeable shares to Tyrell for "business development" work, when, as Plaintiff claims, Tyrell was actually promoting Medifirst's stock—a purpose for which freely tradeable shares cannot be issued without registration.  *See id.* ¶¶ 2-3, 19-100.  Schoengood then filed a Form S-8 on Medifirst's behalf purportedly registering the shares issued to Tyrell, although, as the SEC alleges, Schoengood knew or recklessly disregarded that Tyrell was not eligible to obtain freely-tradeable shares registered under Form S-8 in compensation for promoting stock because the instructions to the form made this restriction clear.  *Id.* ¶¶ 34-35.  Taken together, this conduct constitutes a fraudulent scheme or device under Securities Act Sections 17(a)(1) and (3), Exchange Act Section 10(b), and Rule 10b-5.

Next, the SEC adequately alleges that Schoengood had scienter because he orchestrated the sham Consulting Agreement.  Specifically, he knew that Medifirst was actually issuing the shares to Tyrell in exchange for stock promotion services and not the "business development" purpose set forth in the agreement, and that shares issued for stock promotion could not be registered on Form S-8 to enable the shares to be freely tradeable.  *Id.* ¶¶ 2-4, 27-41, 99-100.  In addition, the SEC claims that Schoengood made false representations to the Transfer Agent and Brokerage Firm for the issuance and deposit of the shares to conceal the scheme.  *Id.* ¶¶ 27-96.  Moreover, beyond the allegations, Schoengood has pled guilty in the parallel criminal

case to conspiracy to commit securities fraud in part based on the same conduct. Schoengood Tr. at 25, 19-23.

In addition, Schoengood's conduct enabled Medifirst to unlawfully issue shares of freely tradeable stock to Tyrell, who then sold his shares to the public at a profit, which he could not have done without registration of the shares. *Id.* ¶¶ 2-5, 19-100. The fraudulent scheme, therefore, occurred "in connection with" the sale of securities satisfying the nexus element.

Finally, under the principles of *respondeat superior*, the Court determines that Schoengood's scienter and conduct can be imputed to Medifirst. Schoengood committed this fraud within the scope of his authority acting as Medifirst's CEO and president, and completed the fraud for Medifirst's benefit because Tyrell was promoting the company's stock. Schoengood signed the sham Consulting Agreement as well as the amendments on Medifirst's behalf and sent emails and letters to facilitate the fraud identifying himself as its CEO or president. *Id.* ¶¶ 30-33, 39-41, 51-53, 57-59, 68-71, 83-84, 87-88. Based on his conduct and scienter, Plaintiff sufficiently alleges that the conduct can be imputed to Medifirst, and it thereby violated the relevant provisions of the securities laws. Accordingly, the Court concludes that Medifirst is liable for violating Securities Act Sections 17(a)(1), 17(a)(3) and Exchange Act 10(b) and Rule 10b-5.

### 2. Plaintiff's Securities Act Sections 5(a) and 5(c) Claims

The SEC's next cause of action against Medifirst is for violations of Securities Act Sections 5(a) and (c). "Section 5 of the Securities Act makes it unlawful, directly

or indirectly, to publicly offer or sell unregistered stock . . . unless the offering is covered by an exemption." *SEC v. Sourlis*, 851 F.3d 139, 143 (2d Cir. 2016) (citing 15 U.S.C. § 77e). To establish that a defendant committed a prima facie violation of Section 5, the Commission must show: "(1) [t]hat the defendant directly or indirectly sold or offered to sell securities; (2) that no registration statement was filed or in effect for the subject securities; and (3) that interstate means were used in connection with the offer or sale." *SEC v. Tecumseh Holdings Corp.*, No. 03 CIV. 5490 (SAS), 2009 WL 4975263, at *3 (S.D.N.Y. Dec. 22, 2009) (internal quotation and citation omitted). "A person not directly engaged in transferring title of the security can be held liable under § 5 if he or she 'engaged in steps necessary to the distribution of [unregistered] security issues.'" *Sourlis*, 851 F.3d at 143 (quoting *SEC v. Chinese Consolidated Benevolent Ass'n*, 120 F.2d 738, 741 (2d Cir. 1941)). This is known as the necessary participant test, which "essentially asks whether, but for the defendant's participation, the sale transaction would not have taken place'—in other words, whether the defendants' acts were a 'substantial factor in the sale transactions.'" *SEC v. Czarnik*, No. 10 CIV. 745 PKC, 2010 WL 4860678, at *11 (S.D.N.Y. Nov. 29, 2010) (quoting *Universal Express, Inc.*, 475 F. Supp. 2d at 422).

As for the second element of a Section 5 violation, the filing of a fraudulent Form S-8 renders registration ineffective for the securities covered by the form. *See SEC v. East Delta Resources Corp.*, No. 10-CV-310 SJF WDW, 2012 WL 3903478, at *4-5 (E.D.N.Y. Aug. 31, 2012) (where the "primary character" of a consultant's role was capital raising and promotional, the Form S-8 registration statement was

rendered void), *aff'd*, 550 Fed. App'x 52 (2d Cir. 2014); *SEC v. Ramoil Mgmt., Ltd.*, No. 01 CIV. 9057 (SC), 2007 WL 3146943, at \*10-11 (S.D.N.Y. Oct. 25, 2007) (finding prima facie violation of Section 5 based on an invalid Form S-8 used to fraudulently register shares that were paid in return for promoting the issuer's stock rather than for bona fide consulting services). Form S-8 allows a company to offer shares of its stock to consultants through its employee benefits program, so long as the consultant provides "bona fide services to the company" that are "not in connection with the offer or sale of securities in a capital-raising transaction, and do not directly or indirectly promote or maintain a market for the registrant's securities." *Ramoil Mgmt., Ltd.*, 2007 WL 3146943, at \*11.

Once the SEC has established its prima facie case, the burden of proof shifts to defendants to show that an exemption or safe harbor from registration exists. *Universal Express, Inc.*, 475 F. Supp. 2d at 422 (citing *SEC v. Ralston Purina Co.*, 346 U.S. 119, 126, 73 S. Ct. 981 (1953)). An exemption from registration is an affirmative defense. *See id.* at 425-26 ("It is the defendant who bears the burden of proving an exemption from the . . . registration requirement.") (citing *Ralston Purina Co.*, 346 U.S. at 126, 73 S. Ct. 981).

Applying these standards, the Court concludes that the SEC has established liability as to Medifirst's violations of Securities Act Sections 5(a) and 5(c). Plaintiff alleges that Medifirst's acts, through Schoengood, were a substantial factor in Tyrell's sales of the company's stock into the public market, and, therefore, Medifirst indirectly sold its securities to the public through Tyrell. Compl. ¶¶ 97-98. Without

Medifirst's sham Consulting Agreement with Tyrell and resulting issuances of shares to him, Tyrell would not have had Medifirst shares to sell to the public. *Id.* ¶¶ 2-5, 19-96.

Next, the Form S-8 that Medifirst filed to register the shares issued to Tyrell was invalid because Medifirst did not issue the shares to him as compensation for bona fide services, but rather for his promotion of Medifirst stock. *Id.* ¶¶ 2-4, 27-29, 34-35, 99-100. Thus, there was no valid registration statement in effect for the shares Tyrell sold to the public.

Finally, Plaintiff states that Medifirst's stock was quoted on OTC Link, an interdealer quotation and trade messaging system, when Tyrell sold them, and he communicated by email with his Brokerage Firm and the Transfer Agent to get the Medifirst shares transferred into Tyrell's brokerage account so that he could sell them. *Id.* ¶¶ 17, 45-46, 48, 54, 65, 80, 94, 97. This satisfies the interstate conduct requirement. *See SEC v. Stanard*, No. 06 CIV 7736(GEL), 2009 WL 196023, at *25 (S.D.N.Y. Jan. 27, 2009) (a phone call or Internet use, including email, satisfies the interstate commerce requirement). Moreover, due to Medifirst's default, it fails to satisfy its burden to establish an exemption from registration. Accordingly, the Court further concludes that Medifirst is liable for violations of Securities Act Sections 5(a) and 5(c).

**B. Relief**

Having determined Medifirst's liability, the Court must assess whether the relief the SEC seeks, a permanent injunction, is warranted. Under Securities Act

Section 20(b) and Exchange Act Section 21(d)(1), the SEC may obtain permanent injunctive relief upon a showing that:  (1) violations of the securities laws occurred; and (2) there is a reasonable likelihood that violations will occur in the future.  *See* 15 U.S.C. §§ 77t(b), 78u(d)(1); *Universal Express, Inc.*, 475 F. Supp. 2d at 428.  In determining the likelihood of future violations, the Court considers:  (1) the degree of scienter involved in the violations that occurred; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of past conduct; (4) the sincerity of the defendant's assurances against future violations; and (5) the likelihood that future violations might occur.  *SEC v. Baldassare*, No. 11-CV-5970 ARR VVP, 2014 WL 2465622, at *7 (E.D.N.Y. May 29, 2014) (citing *SEC v. Universal Major Indus. Corp.*, 546 F.2d 1044, 1048 (2d Cir. 1976)).  "The court enjoys wide discretion to enjoin possible future violations of the federal securities laws upon a finding that it is reasonably likely that further violations will occur," and particularly so in the context of a default judgment where the non-appearing party "has not provided any assurances against future violations."  *Id.*  (analyzing these factors based on the complaint's allegations and granting default judgment permanently enjoining defendants) (citation omitted); *see SEC v. Syndicated Food Servs. Int'l, Inc.*, No. 04-CV-1303 NGG ALC, 2010 WL 4668777, at *1-2 (E.D.N.Y. Nov. 9, 2010) (issuing default judgment permanently enjoining defendant from future violations of the federal securities laws in reliance on the complaint's allegations).

Applying these standards, the Court concludes that the relevant factors weigh in favor of permanently enjoining Medifirst from committing future violations of

Securities Act Sections 5 and 17(a) and Exchange Act Section 10(b) and Rule 10b-5. Initially, Medifirst, through Schoengood, had a high degree of scienter, by knowingly engaging in fraudulent conduct through use of a sham Consulting Agreement, and Medifirst's conduct was not isolated, because it issued shares to Tyrell four times over the course of the fraudulent scheme.  Compl. ¶¶ 2-4, 27-100.  Moreover, Medifirst has defaulted and therefore not recognized the wrongful nature of its conduct or made any assurances against future violations.  Finally, as Plaintiff contends, Medifirst's status as a public company may give it an opportunity to commit fraud again.  As a result, the Court concludes that an injunction is warranted.  The Court, therefore, recommends granting the SEC's motion and entering its proposed order permanently enjoining Medifirst from committing future violations of Securities Act Sections 5 and 17(a) and Exchange Act Section 10(b) and Rule 10b-5.

## IV.   CONCLUSION

For the reasons set forth above, the Court respectfully recommends granting the SEC's motion for default judgment and entering its proposed order permanently enjoining Medifirst from committing future violations of Securities Act Sections 5 and 17(a) and Exchange Act Section 10(b) and Rule 10b-5.  *See* Pl. Mem. Ex. 4, DE [44-6].

## V.   OBJECTIONS

A copy of this Report and Recommendation is being served on Plaintiff by electronic filing on the date below.  Plaintiff is directed to serve a copy of it on Defendants and promptly file proof of serve by ECF.  Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of receipt of this report.  Failure to file objections within the specified time

waives the right to appeal the District Court's order.  *See* 28 U.S.C. § 636(b)(1);

Fed. R. Civ. P. 6(a), 72.

Dated:       Central Islip, New York
             January 9, 2023                    /s/ Steven I. Locke
                                                STEVEN I. LOCKE
                                                United States Magistrate Judge

26